HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LAFOMUA T. VEE, a married man,

Plaintiff,

v.

SCS L.L.C. dba SCS REFRIGERATED
SERVICES, L.L.C., a limited liability
company duly registered and incorporated in
the State of Washington,

Defendant.

Case No. C06-5518 RBL

ORDER

This matter comes before the court on Defendant's Motion for Summary Judgment. The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

**I. BACKGROUND**

Plaintiff in this employment discrimination case, Lafomua T. Vee, is a male Asian-Pacific Islander and native of Samoa who is now a United States citizen. In March of 2004, Mr. Vee applied for a job as a forklift operator at SCS Refrigerated Services ("SCS"), a Washington company that provides refrigerated warehouse space in the Puget Sound region. SCS hired Mr. Vee on July 20, 2004, and assigned him to its Algona, Washington warehouse. Pursuant to a collective bargaining agreement, Mr. Vee's employment was subject to a six-month probationary period, during which he would be evaluated for his performance and suitability for the job.

Although the parties are in disagreement over the semantics, Mr. Vee received some training at

the outset of his employment with SCS. On July 20, 2004, Mr. Vee attended a powered lift truck operator training session consisting of: 1) a "basic module," covering instruction on the safe operation of lifts; 2) a "site orientation," explaining any potentially hazardous conditions affecting the safe operation of lifts in each SCS facility where Mr. Vee might have been assigned (Algona, Tacoma, and Seattle), and 3) an "equipment orientation," covering familiarization with each type of lift Mr. Vee would be authorized to operate [Dkt. #17-1, p. 64]. This training session apparently took place at SCS's Tacoma facility. *See id.* at p. 65. Additionally, Mr. Vee received a two-week training session on the numbering and lettering system used to locate goods at the Algona warehouse [Dkt. #19, p. 2]. There is nothing in the record to indicate the quality of Mr. Vee's performance during this period.

Mr. Vee's troubles with SCS apparently began shortly after the two-week training session in Algona (on or around August 2, 2004) when Mr. Vee was transferred to the Tacoma warehouse. Upon arrival, Mr. Vee's Tacoma supervisor, Rhonda Peck, found that Mr. Vee had trouble performing his assigned tasks [Dkt. #15]. Beginning sometime around the middle of August 2004 and continuing until early September, Ms. Peck documented Mr. Vee's performance problems in a series of evaluation forms and handwritten notes.[1] *Id*. Specifically, Ms. Peck recorded numerous instances where Mr. Vee spilled or ruined food, improperly stacked pallets, failed to follow instructions, damaged packing cases, spilled hydraulic fluid from his forklift, used improper equipment, had difficulty operating the on-board computer system, and repeatedly asked for help from co-workers on the same subjects. *Id*. Ms. Peck's evaluations and notes also indicated her impression that Mr. Vee was not improving and had no motivation to do so. *Id*.

Mr. Vee traces his forklift difficulties at the Tacoma warehouse to two sources. First, while he received training on the numbering system at the Algona warehouse, Mr. Vee apparently was not trained on the Tacoma warehouse's unique numbering system [Dkt. #19, p. 2; Dkt. #17-1, pp. 45-46]. Because of this lack of familiarity with the Tacoma warehouse system, Mr. Vee had difficulty locating items and maneuvering around the Tacoma warehouse and was left to learn the warehouse's peculiarities on his own [Dkt. #19, p. 3]. By contrast, Mr. Vee noticed that at least one other Tacoma

---

[1] The earliest of Ms. Peck's evaluations appear to have occurred on August 18, 2004, with the latest dated September 4, 2004. *See* Dkt. #15, pp. 4-18.

ORDER
Page - 2

forklift operator ("Brian") who started employment after Mr. Vee was shown around the Tacoma warehouse and given instruction on its numbering system [Dkt. #17-1, pp. 45-46].

Next, Mr. Vee ties a sea-change in his treatment as a forklift driver at the Tacoma warehouse to an incident that occurred sometime toward the middle of August 2004. During the incident in question, Mr. Vee was discussing a work assignment with a co-worker named Sonny (a Filipino man) when an assistant supervisor named John Loewens drove by on a forklift and stated, "What do you guys think, is this a Polynesian convention?" [Dkt. #17-1, p. 43].[2] In response, Sonny reported the incident to the Tacoma warehouse's operations supervisor, Greg Tainatongo, and filed a formal complaint against Mr. Loewens the following day [Dkt. #1, pp. 2-3]. Mr. Vee was interviewed about the incident by SCS's human resources director on September 2, 2004. At some point, Mr. Vee also relayed the incident to the Tacoma warehouse general manager, Glen Odonal [Dkt. #19, p. 2]. Mr. Odonal advised Mr. Vee that he had met with Tim Keeler, warehouse shop steward, Mr. Tainatongo, and Ms. Peck to discuss the incident between Sonny and Mr. Loewens.[3] *Id.* Mr. Vee maintains that Ms. Peck's demeanor towards him changed drastically following this meeting. Where she had once been helpful towards Mr. Vee, Ms. Peck now yelled at Mr. Vee and walked away when he attempted to seek help or clarification on an assignment [Dkt. #19, p. 3].

Mr. Vee's recollection of his job performance during this period also stands in stark contrast to Ms. Peck's evaluations. Mr. Vee disputes or denies many of the incidents attributed to him in Ms. Peck's performance evaluations. Specifically, Mr. Vee disputes improperly stacking loads, repeatedly asking the same questions of a co-worker, and most incidents of dumping or spilling products [Dkt. #19, p. 3]. Mr. Vee does not dispute using an inappropriate forklift on August 20, 2004, dumping a load of french fries on August 25, 2004, dropping a load of butter on August 27, 2004, spilling hydraulic fluid from his forklift on August 25 and 30, 2004, and spilling product on September 4,

---

[2] Mr. Vee admits that this was the only comment about Samoans or Pacific Islanders he heard while employed at SCS. Dkt. # 17-1, p. 48-49.

[3] The exact date of this conversation does not appear in the record. Mr. Vee states that this meeting occurred "immediately" after the incident between Sonny and Mr. Loewens. Dkt. #19, p. 2. However, Mr. Vee also describes a September 2, 2004, conversation with SCS human resource staff as occurring "immediately" after the incident when, in fact, the conversation occurred two weeks later. *See id.*; Dkt. #18, p. 3.

2004. However, Mr. Vee attributes these incidents to his being forced to use a defective forklift [Dkt. #19, pp. 3-4].

Mr. Vee's performance troubles seemed to come to a head with the incident on September 4, 2004, when Ms. Peck received a report that Mr. Vee had run into a co-worker's forklift, dropping two boxes of product in the process [Dkt. #17-1, .pp. 23-24].[4]  Mr. Vee was given additional forklift training several days later in the form of safety videos. However, on or around September 14, 2004, Mr. Vee met with the general manager of the Tacoma warehouse, Glen Odonal, who informed Mr. Vee of his negative performance evaluations. Mr. Odonal told Mr. Vee that he could either accept a demotion to utility worker or face termination. Although reluctant to accept because of a pre-existing back problem, Mr. Vee chose to stay on with the company as a utility worker [Dkt. #19, p. 4].

Mr. Vee's activities and performance as a utility worker are also in dispute. Mr. Vee claims that, despite his demotion, a large portion of his workload as a utility worker involved driving a forklift [Dkt. #19, p. 5]. Mr. Vee also received a series of encouraging performance evaluations relating to his forklift operation during this time [Dkt. #19-1-5]. The evaluations noted that Mr. Vee was "improving" and showing "increasing proficiency" with various forklift equipment. *Id*. While SCS does not dispute Mr. Vee's use of a forklift during his time as a utility worker, SCS maintains that Mr. Vee was only allowed to use a forklift as a utility worker for training purposes and, even then, only under supervision [Dkt. #22, pp. 2-3]. Indeed, Mr. Vee was disciplined because of a December 21, 2004, incident where Mr. Vee used a forklift to dump trash without supervision (in violation of Mr. Vee's training agreement and the union contract) [Dkt. #22-1, p. 1]. Additionally, Mr. Keeler, who authored two of Mr. Vee's evaluations during this time, stated that Mr. Vee's performance with forklift equipment, although improving, was not proficient [Dkt. #23, p. 2].

On October 3, 2004, the president of SCS came to the Tacoma warehouse to deliver donuts to the employees [Dkt. #19, p. 5]. During the visit, Mr. Vee approached the president and voiced his displeasure about his treatment by Ms. Peck and his demotion to utility worker. *Id*. However, Mr. Vee did not mention that he believed his poor treatment was due to his race or his support of Sonny's

---

[4] Although he concedes that the incident took place, Mr. Vee disputes Ms. Peck's characterization of the incident and claims that he did not actually collide with the co-worker. Dkt. #17-1, pp. 23-24.

ORDER
Page - 4

complaint [Dkt. #17-1, p. 49]. Mr. Vee also claims that Mr. Keeler spoke with Mr. Odonal about regaining his position as a forklift operator in late October 2004 and that Mr. Keeler reported Mr. Odonal's decision to keep Mr. Vee in the utility worker position despite his recent positive evaluations [Dkt. #19, p. 5]. For his part, Mr. Keeler denies these allegations [Dkt. #23, p. 2].

On December 22, 2004, Mr. Vee injured his back on the job, and his doctor requested that he be restricted to light duty at work [Dkt. #17-1, p. 58]. Although Mr. Vee claims that light duty work was available, SCS could not accommodate the restrictions, and Mr. Vee was laid off. *Id*. at pp. 37-38. The following week, Mr. Vee's doctor lightened the restrictions, but SCS was still unable to accommodate. *Id*. Mr. Vee claims that three white workers who were also suffering from injuries during this time were given light duty.[5] When Mr. Vee was finally cleared for full duty by his doctor, he was nearing the end of his six-month evaluation period. SCS felt that it had not had time to evaluate his potential success as a utility worker and requested that Mr. Vee's union extend his probationary period [Dkt. #22, p. 3]. When the union refused, and based on Mr. Vee's prior work, SCS decided to permanently terminate Mr. Vee's employment on January 19, 2005. *Id*. At pp. 3-4. On February 10, 2005, Mr. Vee filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging race and national origin discrimination [Dkt. #1, p. 2]. The EEOC issued its "right to sue" letter on March 24, 2006, and Mr. Vee commenced the present action.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

---

[5] The workers included "Gene the shop steward," and forklift operators "Bob" and "Jim."

1  (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical
2  doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if
3  there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve
4  the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W.*
5  *Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

6  The determination of the existence of a material fact is often a close question. The court must
7  consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a
8  preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service*
9  *Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the
10 nonmoving party only when the facts specifically attested by that party contradict facts specifically
11 attested by the moving party. The nonmoving party may not merely state that it will discredit the
12 moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the
13 claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non-
14 specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan*
15 *v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### III.  DISCUSSION–"UNOPPOSED" CLAIMS

17 In its response to Mr. Vee's opposition, SCS states that it is entitled to summary judgment on
18 Mr. Vee's failure to accommodate, harassment, and wrongful discharge claims because Mr. Vee did
19 not address these claims in his opposition brief. SCS cites to no authority for this proposition;
20 however, SCS fundamentally misconstrues the standard for granting summary judgment. An opposing
21 party is under "no obligation to offer affidavits or *any other* materials in support of its opposition."
22 *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (emphasis added). "Summary judgment may be
23 resisted and must be denied on no other grounds than that the movant has failed to meet its burden of
24 demonstrating the absence of triable issues." *Id*. As such, the Court will address whether SCS has
25 met its burden with regard to each of Plaintiff's claims.

### IV.  DISCUSSION–DISCRIMINATION AND RETALIATION

27 **A.      Burden Shifting Analysis**
28 In analyzing employment discrimination claims under Title VII, 42 U.S.C. § 2000e ("Title

VII"), the Americans With Disabilities Act, 42 U.S.C. § 12112(a) ("ADA"), and Washington's Law Against Discrimination ("WLAD"), Wash. Rev. Code § 49.60, courts use the three-part burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See also, Domingo v. Boeing Employees' Credit Union*, 124 Wash. App. 71, 84 (2004). First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Next, if the plaintiff meets this burden, the defendant must articulate some "legitimate nondiscriminatory reason for the employee's rejection." *Id*. Finally, if the employer satisfies this burden, "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.*

To avoid summary judgment, a plaintiff "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses. [He] must produce specific, substantial evidence of pretext." *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Pretext may be demonstrated "either directly, by persuading the court that a discriminatory reason more likely [than not] motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

**B.     Hostile Work Environment Claims**

Mr. Vee alleges that his treatment at SCS gives rise to hostile work environment claims under both Title VII and WLAD. To establish a *prima facie* case in a hostile workplace claim premised on race or sex, a Title VII plaintiff must show: "that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). Similarly, a *prima facie* case of a hostile work environment under WLAD must be established by showing that the harassment: (1) was unwelcome; (2) was because the plaintiff was a member of a protected class; (3) affected the terms and conditions of employment; and (4) was imputable to the employer. *Clarke v. State Attorney General's Office*, 133 Wash. App. 767, 785 (2006). As with Title VII harassment, the conduct must also be "sufficiently pervasive so as to alter [the plaintiff's] employment conditions." *Id*. (citing *Washington v. Boeing*, 105 Wash. App. 1, 10 (2000)).

To determine whether conduct was sufficiently severe or pervasive, courts are to look to the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating (as opposed to a merely offensive utterance), and whether the conduct unreasonably interferes with an employee's work performance. *Vasquez*, 349 F.3d at 642. Simple teasing, offhand comments, and isolated incidents do not amount to discriminatory changes in the terms and conditions of employment. *Id*.

Mr. Vee's hostile work environment claims rest solely on John Loewens' "Polynesian convention" comment and Rhonda Peck's negative attitude towards Mr. Vee during the approximately four weeks that he was under her supervision. Viewed in light of other cases, however, these allegations do not create the kind of pervasively hostile working environment that is actionable under the law. For example, in *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990), the court dismissed plaintiff's hostile work environment claim, holding that no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino. *Id.* at 1031, 1036. The allegations in *Sanchez* were significantly more severe than those in this case, yet the *Sanchez* court held as a matter of law that there was no hostile work environment.

Washington courts have adhered to a similarly high standard, requiring a pattern of ongoing, systematic abuse that is simply not present in Mr. Vee's situation. For example, in *Campbell v. State*, 129 Wash. App. 10 (2005), the defendant created a hostile work environment where plaintiff's supervisor repeatedly made comments such as "women should stay at home and make babies" and "women are useless"; plaintiff was told that her desk could be "raped" at any time; plaintiff was sent a flood of harassing emails, some of which depicted violence towards women and purported to "have a little fun" with plaintiff; and, plaintiff was told that women should be "softer and friendlier" and called a "serious puss." *Id*. at 16-17.

Because Mr. Vee's allegations do not rise to the level of harassment sufficiently pervasive to alter Mr. Vee's employment conditions, Mr. Vee has failed to establish a *prima facie* case of hostile work environment under either Title VII or WLAD. Consequentially, Mr. Vee's racially motivated

hostile work environment claims must be DISMISSED.

### C. Disability Discrimination Claims

#### 1. Federal Claim

In his complaint, Mr. Vee alleges that SCS's failure to make reasonable accommodation for his December 2004 back injury gives rise to a violation of Title VII because a primary motivation for terminating Mr. Vee was his injury. Although a cause of action may exist for such conduct under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12209 ("ADA"), Title VII does not address discrimination by an employer based on disability. The parties did not address this issue. However, because Mr. Vee did not plead a cause of action under the ADA, the court need not address any potential ADA claim. Therefore, Mr. Vee's federal claim for disability discrimination must be DISMISSED.

#### 2. State Claim

Mr. Vee has properly pled a claim of disability discrimination under state employment discrimination laws. Specifically, the WLAD prohibits employers from discharging or discriminating against an employee because of "the presence of any sensory, mental, or physical disability." Rev. Code Wash § 49.60.180(2), (3) (2007). These provisions create disability discrimination claims under two theories: disparate treatment and failure to accommodate. *See McClarty v. Totem Electric*, 157 Wash.2d 214, 222 (2006). "An employer who discharges, reassigns, or harasses for a discriminatory reason faces a disparate treatment claim; an employer who fails to accommodate the employee's disability faces an accommodation claim." *Id*. (internal quotations and citations removed).

To establish a *prima facie* case under either theory, Mr. Vee must show that he is disabled under the meaning of the WLAD. *See Riehl v. Foodmaker, Inc.*, 152 Wash. 2d 138, 150 (2004) (listing elements of *prima facie* disparate treatment claim); *Doe v. Boeing Co.*, 121 Wash.2d 8, 16 (1993) (listing elements of *prima facie* accommodation claim). However, the standard for establishing disability under the WLAD is currently in a state of flux. In 2006, the Washington Supreme Court adopted the federal definition of disability as set out in the ADA, holding that "a plaintiff brining suit under the WLAD establishes that he has a disability if he has (1) a physical or mental impairment that substantially limits one or more of his major life activities, (2) a record of such an impairment, or (3) is regarded as having such an impairment." *McClarty*, 157 Wash.2d at 220. In response to *McClarty*,

the Washington Legislature amended the WLAD to explicitly reject the ADA's narrow definition of "disability." S.B. 5340, 60th Leg., 2007 Reg. Sess. § 1 (Wash. 2007) ("S.B. 5340"). Noting that the WLAD provides protections "wholly independent" of the ADA, the legislation states that "a disability exists whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity[.]" *Id.* The Legislature also made S.B. 5340 "remedial and retroactive," applying to all causes of action occurring before July 6, 2006, (the date of the *McClarty* decision) and after the effective date of the legislation (July 22, 2007). *Id.* Because Mr. Vee's causes of action occurred between August 2004 and January 2005, S.B. 5340 lowers the bar for Mr. Vee to establish that his back injury constituted a disability.

SCS has not clearly set out its theory regarding the current definition of "disability" under WLAD. In a footnote, SCS points to a recent order by United States District Court Judge Marsha Pechman declaring that S.B. 5340 violates Washington's separation of powers doctrine.[6] *See Varga v. Stanwood-Camano School Dist.*, No. C06-178 [Dkt. #58]. SCS then proceeds to analyze Mr. Vee's state disability claims under the ADA standard.

Federal Rule of Civil Procedure 5.1 requires that a party filing a pleading, written motion, or other paper challenging the constitutionality of a state statute must notify the state attorney general. Fed. R. Civ. P. 5.1(a). The court must also certify to the state attorney general that there is a constitutional challenge. Fed. R. Civ. P. 5.1(b). The attorney general then has 60 days after the filing of notice to intervene. Fed. R. Civ P. 5.1(c). While the court may reject the constitutional challenge in the interim, the court may not enter a final judgment holding the statute unconstitutional. *Id*.

Again, SCS's "challenge" to S.B. 5340 is lukewarm, and the briefing on the subject is certainly not unequivocal. If SCS does indeed make such a challenge, however, it is clear that the mandates of Rule 5.1 must be followed. Therefore, the Court directs SCS to inform the Court, within seven (7) days of entry of this Order, whether such a challenge is being made. If so, the procedures of Rule 5.1 will be invoked and the Attorney General will be given time to intervene; if not, the Court will immediately address the merits of Mr. Vee's WLAD disability claims under the standard set out by S.B. 5340.

---

[6] Judge Pechman has since stayed the order pending certification to the State Attorney General's Office pursuant to Federal Rule of Civil Procedure 5.1. *See Varga*, No. C06-178 [Dkt. #65].

### D. Racial Discrimination Claims

Mr. Vee alleges that he received disparate treatment during his employment with SCS because of his race. Specifically, Mr. Vee claims that he did not receive the same on-site training as white workers at the Tacoma warehouse, was given a malfunctioning forklift, and was yelled at and singled out by his supervisor during his tenure as a forklift operator. After his demotion to utility worker, Mr. Vee claims that his positive performance evaluations were disregarded by management and that he was not given light duty while injured when other, non-Samoan workers were.

To establish a *prima facie* case of racial discrimination based on disparate treatment under either Title VII or WLAD, Mr. Vee must establish that: (1) he belongs to a protected class of persons; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) SCS treated him differently than similarly situated employees who do not belong to the same protected class. *See McDonnell Douglas*, 411 U.S. at 802; *Domingo*, 124 Wash. App. at 80. The parties seem to be in agreement that Mr. Vee has satisfied the first and third elements and devote their briefing to whether Mr. Vee was performing his job satisfactorily and whether similarly situated, non-Samoan employees were treated differently.

A review of the record indicates that Mr. Vee has produced the nominal amount of evidence necessary to establish his *prima facie* showing of discrimination. First, Mr. Vee has stated that he was "doing fine" as a forklift operator and observed other employees operating below his level [Dkt. #17-1, pp. 26, 47]. Although SCS has produced evidence of numerous instances demonstrating that Mr. Vee's on-the-job performance was less than stellar (some of which are not denied by Mr. Vee), his burden at this stage is "minimal." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002). Indeed, Mr. Vee's subjective evaluations of his performance are probably sufficient by themselves to establish that he was performing satisfactorily. *See id.* (employee's self-assessment is enough to satisfy *prima facie* showing of satisfactory performance). However, Mr. Vee does not rest completely on his own self-assessments. Mr. Vee points to evaluations of his forklift performance, recorded after his demotion to utility worker, that contrast with Mr. Peck's stark assessments of his abilities. While SCS has produced evidence to rebut the positivity of these later evaluations, there is no doubt that the evaluations provide at least some evidence of Mr. Vee's forklift abilities. As such, Mr. Vee has presented the nominal evidence necessary to meet his burden regarding satisfactory

performance.

Next, to establish the fourth element, Mr. Vee must show that SCS treated similarly situated, non-Samoan employees more favorably. *See Moran v. Selig*, 447 F.3d 748, 756 (9th Cir. 2006). In his deposition, Mr. Vee lists a panoply of employees that he feels received preferential treatment. *See* Dkt. #17-1, pp. 45-47. With most of the employees, Mr. Vee either fails to establish their employment status or acknowledges that they were *not* similarly situated (i.e. superiors). *Id*. However, Mr. Vee did identify "Brian," a fellow forklift operator hired at roughly the same time as Mr. Vee, who was given a two-week orientation on the Tacoma numbering system that Mr. Vee was apparently denied. *Id*. at 45-46. Although this evidence is scant, *at best*, the Court is mindful that Mr. Vee needs very little evidence to create a prima facie case. *See Aragon*, 292 F.3d at 660. As a result, the Court is satisfied that Mr. Vee has met his *prima facie* showing with regard to his racial discrimination claims.

### E.   Retaliation Claims

Mr. Vee claims also that his treatment at SCS, including his demotion and subsequent termination, was in retaliation for having assisted Sonny's complaint against John Loewens' racially-motivated remark.[7] To establish a *prima facie* case of retaliation, Mr. Vee must show that "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994)); *Washington v. Boeing Co.*, 105 Wash. App. 1, 14 (2000).

As noted *supra*, the parties do not dispute that Mr. Vee suffered adverse employment actions. Specifically, Mr. Vee received highly negative performance evaluations during August and September 2004 and later faced demotion and eventual termination.[8] However, SCS asserts that Mr. Vee has not

---

[7] In his complaint, Mr. Vee alleges that his treatment and termination was violative of 42 U.S.C. § 2000e(a) (defining the term "person") and Wash. Rev. Code § 46.60.210 (non-existent). The Court assumes that Mr. Vee intended to allege violations of 42 U.S.C. § 2000e-3(a) and Wash. Rev. Code § 49.60.210.

[8] Even if SCS disputed the issue whether Mr. Vee's performance evaluations constituted an adverse employment action, the Court is satisfied that the evaluations meet the requisite standard. The EEOC has broadly interpreted "adverse employment action" to mean "any adverse treatment that is ... reasonably likely to deter the charging party or others from engaging in protected activity." EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998). This test is consistent with Ninth Circuit holdings. *Henderson*, 217 F.3d at 1242-43. As such, a negative performance evaluation, especially given during an employee's probationary period, would certainly rise to the level of a deterrent.

ORDER
Page - 12

established that he engaged in a protected activity or, if he did, that a causal link exists between the protected activity and the adverse action.

SCS cites *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978) for the proposition that a co-employee, acting in an individual capacity, is incapable of committing an unlawful employment practice and, thus, that a complaint about such acts is not a protected activity for purposes of a Title VII retaliation claim. *See Silver*, 586 F.2d at 140-41. However, *Silver* is not an accurate representation of the law. Since *Silver* was decided, the Ninth Circuit has clarified that a plaintiff need not prove that the employment practice at issue was actually violative of Title VII. *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). To establish that he engaged in a protected activity, a plaintiff need only show that "[he] had a 'reasonable belief' that the employment practice [he] protested was prohibited under Title VII." *Id.* (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)).

Applying the standard as articulated in *Trent*, the Court's review of the record indicates that Mr. Vee's belief about the illegality of Mr. Loewens' comments was reasonable. Mr. Vee and Sonny were apparently on-the-clock and engaged in a work related discussion when the comment was made, and Mr. Loewens was in a supervisory role over both men at the time. Consequentially, Mr. Vee was justified in believing that Title VII would provide protection from such remarks.

Next, to establish a causal link, Mr. Vee must show that the protected activity actually played a role in the employer's decision-making process and had a determinative influence on the outcome. *See Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005); 42 U.S.C. § 2000e-2(m). Mr. Vee has presented no direct evidence to establish that his participation in Sonny's complaint had an impact on SCS's actions. However, causation may be inferred by "proximity in time between the protected action and the allegedly retaliatory employment decision." *Henderson*, 217 F.3d at 1244 (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1371 (9th Cir. 1987)). For example, the *Henderson* court found that the plaintiff had satisfied his burden regarding causation by showing that: 1) the employer implemented a "lockdown" immediately after receiving a copy of the plaintiff's EEO complaint; 2) the employer altered the plaintiff's work schedule in an disadvantageous way a month after receiving the complaint; and 3) the employer reduced the plaintiff's workload and pay two months after the plaintiff filed two more EEO complaints. *Henderson*, 217 F.3d at 1239. Other

courts have inferred a causal link when an adverse employment action was taken within several months of a protected activity. *See, e.g., Yartzoff*, 809 F.2d at 1376 (sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended); *Miller v. Fairchild Indust., Inc.*, 797 F.2d 727, 730 (9th Cir. 1986) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings).

On the other hand, timing alone is not sufficient to show causation in all cases. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). "In order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." *Id.* (internal citations and quotations omitted). *See also, e.g., Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000) (finding a one-year interval between the protected expression and the employee's termination, standing alone, too long to raise an inference of discrimination); *Filipovic v. K&R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months too long); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998), cert. denied, 528 U.S. 988 (1999) (eight months too long); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five months too long); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four months too long).

On the record before the Court, Mr. Vee has sufficiently raised a causal inference. Mr. Vee's demotion to utility worker occurred less than two weeks after his interview with SCS human resources staff regarding the Loewens incident. Additionally, Mr. Vee states that he "immediately" reported the incident to warehouse General Manager Glen Odonal. Viewed in the light most favorable to Mr. Vee, and in light of the fact that the incident happened towards the end of the first two weeks of August 2004, Ms. Peck's negative evaluations of Mr. Vee began mere days after Mr. Vee reported the incident to Mr. Odonal. As a result, Mr. Vee has met his burden to establish a *prima facie* case of retaliation.

### F.     Pretext

Because Mr. Vee has established *prima facie* cases of discrimination and retaliation, the burden has shifted to SCS to show that it had legitimate, non-discriminatory reasons for its actions. SCS has met this burden by producing ample evidence to show that Mr. Vee's demotion and

1  termination was motivated by his poor performance and violation of union and SCS policy.  Thus, the
2  presumption of unlawful discrimination "simply drops out of the picture," and the burden shifts back
3  to Mr. Vee to show that SCS's non-discriminatory motivations were mere pretexts.  *See St. Mary's*
4  *Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

5  Pretext may be shown using either direct or circumstantial evidence.  *Coghlan v. American*
6  *Seafoods Co. LLC*, 413 F.3d 1090, 1094 (9th Cir. 2005).  Direct evidence "is evidence which, if
7  believed, proves the fact of discriminatory animus without inference of presumption[,]" and typically
8  consists of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer."
9  *Id*. at 1095 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir.1998)).  On the
10 other hand, circumstantial evidence "requires an additional inferential step to demonstrate
11 discrimination."  *Id*.  Circumstantial evidence can take two forms:

> First, the plaintiff can make an affirmative case that the employer is biased.  For example, statistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias.  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is "unworthy of credence."

15 *Id.* (internal quotations and citations omitted).  The amount of evidence necessary to survive a motion
16 for summary judgment is corollary to the type of evidence presented.  *Id*.  Plaintiff need offer "very
17 little" direct evidence to raise a genuine issue of material fact.  *Id*.  "But when plaintiff relies on
18 circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's
19 motion for summary judgment."  *Id*. (citing *Godwin*, 150 F.3d at 1222).

20 Mr. Vee offers slightly less than "very little" direct evidence that SCS's proffered motivations
21 are a mere pretext for racial discrimination.  Indeed, Mr. Vee's lone shred of direct evidence consists
22 of John Loewens' "Polynesian convention" comment.  Also, Mr. Vee presents no direct evidence of
23 SCS's retaliatory intent.  However, Mr. Vee points to circumstantial evidence to support his argument
24 that SCS's proffered motivations are not credible.  First, Mr. Vee asserts that his five "positive"
25 forklift performance evaluations, recorded after his demotion to utility worker, would allow a jury to
26 infer that Ms. Peck's earlier evaluations were biased or fabricated.  Although SCS submitted an
27 affidavit from one of the authors of these later evaluations stating that the evaluations do not
28 demonstrate Mr. Vee's proficiency, there is no doubt that the later reports, at the very least, contrast
   with Ms. Peck's assessments.  Thus, a jury could infer that the earlier evaluations were the result of an

improper motive on the part of SCS.

Next, to determine whether a defendant's rationales are a pretext for retaliation, a jury can also consider the timing of adverse actions. *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir. 1989). For example, the *Miller* court found that a jury could find pretext based on adverse employment actions that occurred 42 and 59 days after the plaintiffs filed EEOC claims. As noted above, Mr. Vee's negative performance evaluations and demotion to utility worker followed closely on the heels of John Loewens' racial comment and Mr. Vee's support of, and participation in, Sonny's complaint about the comments. Mr. Vee's eventual termination occurred just over four months after the participation. The Court cannot rule out the possibility that a reasonable jury could infer that Mr. Vee's assistance in Sonny's complaint triggered his demotion and termination.

Although, this evidence does not raise a strong inference of impermissible motives on the part of SCS, Mr. Vee's burden is not particularly onerous. *See, e.g., Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1032-34 (9th Cir. 2006) (While "[t]he truth might be that all of [defendant's] management aims were legitimate and matters of prerogative and personal style," summary judgement was not appropriate because a reasonable jury *could* infer a discriminatory intent if it determined that the defendant's explanations were not credible.); *Sischo-Nownejad,* 934 F.2d at 1111 ("When [plaintiff's] evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will *almost always* exist with respect to any claim of a nondiscriminatory reason.") (emphasis added). As such, the Court is satisfied that, Mr. Vee has presented evidence sufficient to raise an issue of material fact regarding whether SCS's proffered motivations were merely pretextual. Accordingly, SCS's motion for summary judgment as to Mr. Vee's discrimination and retaliation claims must be DENIED.

### V. DISCUSSION-Common Law Wrongful Discharge Claim

Generally, employment in Washington is considered at-will, and an employer may discharge an employee at any time, with or without cause. *Reninger v. State Dep't of Corrections*, 134 Wash.2d 437, 446 (1998) (citing *Roberts v. Atlantic Richfield Co.*, 88 Wash.2d 887, 891 (1977)). However, Washington courts recognize an exception to this general rule and allow a cause of action for the tort of wrongful discharge where "the discharge of [an] employee contravenes a clear mandate of public

policy."[9] *Id.* (quoting *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 232 (1984)). "The touchstone of these exceptions is whether the employee's termination would contravene some public, as opposed to a purely private, interest." *Reninger*, 134 Wash.2d at 447.

Washington courts have identified "four necessary elements upon which a common law claim for wrongful discharge in violation of public policy must be heard[.]" *Roberts v. Dudley*, 140 Wash.2d 58, 64 (2000). The plaintiff must prove (1) the existence of a clear public policy; (2) that the public policy would be jeopardized by discouraging the conduct in which they engaged; and (3) that the conduct caused the dismissal; the defendant must then not be able to offer an overriding justification for the dismissal. *Id.* Finally, "[i]n determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, *statutory*, or regulatory provision or scheme." *Id.* at 63 (quoting *Thompson*, 102 Wash.2d at 232) (emphasis added).

Mr. Vee does not clearly set out his theories regarding wrongful discharge and does not explicitly identify the public policy that is jeopardized by his termination. What is clear from his complaint, however, is that Mr. Vee bases his wrongful discharge claim on the totality of his treatment as an SCS employee. Thus, it is apparent that the public policy at issue is the right to be free from discrimination and retaliation in the workplace.

Washington courts have held that employer actions such as those alleged by Mr. Vee are sufficient to trigger public policy concerns. For example, in *Roberts*, the Washington Supreme Court looked to the WLAD as a "strong public policy basis" for a claim of wrongful discharge. *Id.* at 72. There, the court held that a plaintiff's claim for wrongful discharge could be based on sex discrimination despite the fact that the WLAD did not apply to plaintiff's claim because of the employer's size. In *Bennett v. Hardy*, the court also recognized that the WLAD's prohibition of workplace retaliation provides a public policy basis to support a wrongful discharge claim. 113 Wash.2d 912, 925 (1990).

---

[9] Washington courts have generally found such a contravention of public policy in four situations: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing." *Gardner v. Loomis Armored Inc.*, 128 Wash.2d 931, 936 (1996).`

As a result, there should be little question that the conduct alleged in the present action satisfies the public policy element.  Because Mr. Vee has raised genuine issues of material fact regarding racial discrimination and retaliation, the Court cannot find, as a matter of law, that Mr. Vee cannot meet the remaining elements of wrongful discharge.  Therefore, SCS's motion for summary judgment as to Mr. Vee's wrongful discharge claim must be DENIED.

## VI.  CONCLUSION

The defendant's motion for summary judgment, Dkt. #14, is GRANTED with respect to plaintiff's federal disability discrimination claim, is GRANTED with respect to the Title VII and WLAD hostile workplace claims, but is DENIED with respect to the Title VII and WLAD discrimination and retaliation claims and DENIED with respect to the common law wrongful termination claim.  Further, the Court directs defendant to inform the Court, within seven (7) days of entry of this Order, whether defendant makes a constitutional challenge to S.B. 5340.

IT IS SO ORDERED this 24th day of September, 2007.

> RONALD B. LEIGHTON
> UNITED STATES DISTRICT JUDGE